T.C. Memo. 1999-159


UNITED STATES TAX COURT


PAUL MIFSUD AND MARIA G. MIFSUD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12569-97.                    Filed May 12, 1999.


<u>B. Gray Gibbs</u>, for petitioners.

<u>Charles A. Baer</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:  Respondent determined the following de-
ficiencies in, and fraud penalties under section 6663[1] on, peti-
tioners' Federal income tax (tax):

---

[1]  All section references are to the Internal Revenue Code
in effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

|      |            | Fraud    |
| Year | Deficiency | Penalty  |
|------|------------|----------|
| 1992 | $18,087    | $13,565  |
| 1993 | 15,653     | 11,740   |
| 1994 | 17,073     | 12,805   |

In respondent's answer, respondent alleged in the alternative, inter alia, that petitioners fraudulently and with intent to evade tax understated their income tax liability for 1992, 1993, and 1994 in the amounts of $26,132, $30,201, and $39,712, respectively.

The issues remaining for decision are:

(1)  Do petitioners have unreported income reconstructed under the bank deposits method for 1992, 1993, and 1994?  We hold that they do in the amounts of $73,233.69, $80,607, and $103,724, respectively.[2]

(2)  Are petitioners liable for the fraud penalty under section 6663 for each of the years 1992, 1993, and 1994?  We hold that they are.

(3)  Did the period of limitations for 1992 prescribed by section 6501 expire?  In light of our holding in (2) above, we hold under section 6501(c)(1) that it did not.

---

[2]  During the trial in this case, the parties agreed that petitioners have unreported income attributable to their personal use of restaurant goods for each of the years at issue in the amount of $2,600.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioners, Paul Mifsud (Mr. Mifsud) and Maria G. Mifsud (Ms. Mifsud), resided in Hudson, Florida.

Ms. Mifsud emigrated from Malta to the United States around 1952 or 1953, when she was 13 years old. Mr. Mifsud, who was one of ten children, and his father, also named Paul Mifsud, emigrated from Malta to the United States in 1951, when Mr. Mifsud was around 14 years old and his father was around 47 years old. One of Mr. Mifsud's brothers and one of his sisters had previously emigrated to the United States in 1947 and 1950, respectively. Mr. Mifsud's mother and two of his brothers emigrated to the United States in 1953, and his other brothers came to the United States thereafter. At the time of the trial in this case, Mr. Mifsud's mother, who was still living in the United States, was 94 years old and very ill. At that time, she was living on funds that Mr. Mifsud and certain of his siblings sent to her for her care and on Social Security payments which she was receiving and which were attributable to the earnings of her husband from his employment in the United States.

During World War II, Malta was devastated by German air strikes. Estimates of Maltese national income in the postwar period ranged from $28.2 million to $44.3 million. In 1951, when

Mr. Mifsud and his father emigrated from Malta to the United States, Malta was a country of small shopkeepers, dockworkers, and bureaucrats, with a small Anglo-Maltese ruling class, and the median wage for private workers in Malta was about $11 per week, or $572 per year.

Maltese official records show only two purchases and one sale of real property by Mr. Mifsud's father and one sale of real property by Mr. Mifsud and certain of his family members. In November 1929, Mr. Mifsud's father purchased a house in Malta for 570 British pounds sterling (pounds), which was the official currency of Malta. In April 1937, he sold that house for 270 pounds. In September 1938, Mr. Mifsud's father purchased another house in Malta for 350 pounds. In 1966, Mr. Mifsud, along with his mother, three brothers, and a sister, sold a house in Malta for 2,600 pounds, or $7,254 at the exchange rate in effect in 1966 of $2.79 per pound.

In 1951, Malta was under English exchange controls which limited the ability of Maltese persons to bring any form of currency out of the country. The export in 1951 of currency from Malta in an amount of pounds or any other form of currency equal to approximately $500,000 would have had a serious impact on Malta's economy and the policy of its Government and would have been required by the English exchange controls to have been documented. Malta has no official record that an export from

Malta took place in 1951 of currency in an amount of pounds or any other form of currency equal to approximately $500,000.

Mr. Mifsud, who lived with his father after he arrived in the United States in 1951, began working about one year thereafter, when he was around 15 years old. Since that time until petitioners moved to Florida in 1980, Mr. Mifsud worked at different times in the kitchens of a few hotels in the Detroit metropolitan area, in the kitchen of a cafeteria at Ford Motor Company, in a restaurant in the Detroit metropolitan area, and at a Ford Motor Company plant. For a period of years during the 1960's, Mr. Mifsud also operated a laundromat. Around 1974, petitioners purchased a restaurant in the Detroit metropolitan area, which they operated until they moved to Florida in 1980.

Petitioners, who married in 1960, have two daughters, Diana Mamo (Ms. Mamo) and Geraldine, who were born in 1962 and 1966, respectively. Throughout the years at issue, Ms. Mamo was married to Joe Mamo (Mr. Mamo), and they have children from that marriage. They divorced in 1995.

In December 1979, while petitioners were living in Michigan, a robbery occurred at their house during which $40,000 was stolen from a safe. In 1980, they sold the restaurant that they owned and operated in Michigan and moved to Florida. When petitioners first moved to Florida, they rented a house in Embassy township. Shortly thereafter, they purchased a house in Port Richey,

Florida.  Around 1989 or 1990, petitioners purchased a house in Hudson, Florida, in which they resided at the time of the trial in this case.

Shortly after petitioners moved to Florida, they, together with their daughter Ms. Mamo and her husband Mr. Mamo, organized Paul & Joe, Inc., an S corporation, for the purpose of acquiring and operating Spring Hill Family restaurant (Spring Hill restaurant).  At all relevant times, petitioners owned in the aggregate 60 percent, and Ms. Mamo and Mr. Mamo owned in the aggregate 40 percent, of the stock of Paul & Joe, Inc.  Spring Hill restaurant is located near Weehi Wachee Springs, a major Florida tourist attraction.

Around 1990, petitioners, together with their daughter Ms. Mamo and her husband Mr. Mamo, organized Nichole & Eric, Inc., an S corporation, for the purpose of operating a restaurant known as Breakfast Club of 7 Hills.  At all relevant times, petitioners owned in the aggregate 50 percent, and Ms. Mamo and Mr. Mamo owned in the aggregate 50 percent, of the stock of Nichole & Eric, Inc.

Around 1991, petitioners, together with their daughter Geraldine and her husband, organized Crystal & Ryan, Inc., an S corporation, for the purpose of operating a restaurant known as The Breakfast Club.  At all relevant times, petitioners owned in the aggregate 51 percent, and their daughter Geraldine and her

husband owned in the aggregate 49 percent, of the stock of Crystal & Ryan, Inc.

In 1994, petitioners organized The Mifsuds, Inc., an S corporation, for the purpose of operating a restaurant known as Rams Horn.  During that year, petitioners owned 100 percent of the stock of The Mifsuds, Inc.

When Paul & Joe, Inc., first began operating Spring Hill restaurant, Mr. Mifsud and Mr. Mamo, his son-in-law, worked principally as cooks, Ms. Mifsud operated the cash register, and occasionally Ms. Mamo operated the cash register and served as a hostess in the dining room of that restaurant.

Around 1983, Mr. Mamo had an automobile accident, was forced to quit working at Spring Hill restaurant, and did not return to work there until around 1985 or 1986.  When Mr. Mamo returned to work at Spring Hill restaurant, he worked at the cash register and served as a host in the dining room.  Mr. Mamo stopped working at Spring Hill restaurant around October 1991 and started working at Breakfast Club of 7 Hills, which was owned by Nichole & Eric, Inc.  Thereafter, he had no further involvement in the operations of Spring Hill restaurant, although he and Ms. Mano continued to own 40 percent of the stock of Paul & Joe, Inc., which owned that restaurant.

After Mr. Mamo's accident in 1983, Mr. Mifsud stopped working as a cook at Spring Hill restaurant and began, and

continued throughout the years at issue, to work up front at that restaurant, primarily operating the cash register. Around 1985 or 1986, when Mr. Mamo returned to work at Spring Hill restaurant, Mr. Mifsud was running the afternoon shift at that restaurant. After Mr. Mamo stopped working at Spring Hill restaurant in 1991, Mr. Mifsud was solely responsible for running that restaurant.

During the years at issue, Mr. Mifsud also spent time working at the cash register and in the dining room of The Breakfast Club, which was owned by Crystal & Ryan, Inc.

When Paul & Joe, Inc., first began operating Spring Hill restaurant, it could accommodate approximately 55 customers. Around 1986, the size of that restaurant was expanded to accommodate approximately 160 customers.

During the years at issue, Spring Hill restaurant was open for breakfast, lunch, and dinner. At all relevant times, the peak period during the year for business at Spring Hill restaurant lasted from around September until Easter, which was the peak tourist season in Florida. Business at the Spring Hill restaurant declined somewhat as peak tourist season in Florida declined after Easter through around August.

Since Paul & Joe, Inc., first began operating Spring Hill restaurant, Mr. Mifsud has been the only person who closed out the cash register at that restaurant. The business records for

Spring Hill restaurant for the years at issue relating to, inter alia, that restaurant's gross receipts consisted of sheets of paper referred to by petitioners as sales sheets (sales sheets). Mr. Mifsud prepared a sales sheet for each week day during those years and made entries on each such sheet on each night of each such week. Each sales sheet contained for each day of the week, inter alia, a column headed "SALES". During the years at issue, each night after Mr. Mifsud closed out the cash register at Spring Hill restaurant, he filled in an amount under that column, which purported to show that restaurant's total daily gross receipts reflected on the cash register tape and guest checks for each day. During the years at issue, each night after Mr. Mifsud completed the sales sheet for the day, he discarded the cash register tape and guest checks for that day. During those years, each night after Mr. Mifsud closed out the cash register at Spring Hill restaurant, he brought the cash receipts from that day's restaurant operations to his house.

At all relevant times, Mr. Mifsud, who was knowledgeable about Federal deposit insurance which insures U.S. deposits of one person up to $100,000, and Ms. Mifsud maintained multiple bank accounts. As of December 31, 1991, petitioners had $220,872.67 on deposit at Barnett Bank, $160,000 of which was in a certificate of deposit, $55,952.82 of which was in an individual retirement account, and $4,919.85 of which was in a checking

account. During the years at issue, petitioners maintained bank accounts at Barnett Bank, Sun Bank, and Citizens Federal. During 1993 and 1994, petitioners also maintained a bank account at Great Western Bank. During the years at issue, petitioners made numerous deposits of cash into their bank accounts, which, for the most part, were regularly made throughout the year in relatively small amounts (i.e., around $1,000 or less). In 1993, Great Western Bank issued a cash transaction report with respect to petitioners because they made two cash deposits on August 20 of that year, which totaled in excess of $10,000.

During the years at issue, petitioners deposited the following aggregate amounts into their bank accounts at the banks indicated:

|                      | 1992         | 1993      | 1994      |
|----------------------|--------------|-----------|-----------|
| Barnett Bank         | $103,595.40  | $118,519  | $183,044  |
| Great Western Bank   | --           | 47,863    | 70,086    |
| Sun Bank             | 19,691.10    | 7,610     | 12,221    |
| Citizens Federal     | 73,811.19    | 30,952    | 23,490    |
| Total Deposits       | 197,097.69   | 204,944   | 288,841   |

At all relevant times, Mr. Mifsud paid attention to the economy and to changes in interest rates and how such changes might affect petitioners. For example, when interest rates fell, Mr. Mifsud contacted Barnett Bank in order to refinance petitioners' house at a lower interest rate. At all relevant times, Mr. Mifsud also was concerned with the interest that petitioners were

able to earn on their bank deposits. If there was a better rate of interest accruing on certificates of deposits, Mr. Mifsud transferred funds from one or more of petitioners' checking accounts and/or savings accounts in order to buy such a certificate, even though he recognized that a certificate of deposit was not as liquid an asset as a checking or other similar bank account. At all relevant times, Mr. Mifsud was aware that he could not redeem a certificate of deposit before maturity without incurring a financial penalty, as compared to withdrawing funds at any time from a checking account or similar bank account. Mr. Mifsud was not aware of any U.S. bank that had failed and thereby caused injury to its depositors.

At all relevant times, petitioners financed through loans the purchases of their residences, businesses, and automotive vehicles and paid interest on those loans. After petitioners moved to Florida, they purchased on credit at least the following automotive vehicles: a 1979 Datsun 240Z, a 1986 Ford Bronco, a 1988 Lincoln Town Car, a 1988 Cadillac Eldorado, a 1990 Lexus LS-400, a 1983 Datsun 240Z, a 1992 Cadillac Seville, a 1992 Honda Accord EX, and two 1995 Lincoln Town Cars.

Mr. Mifsud submitted a credit application to Ford Motor Credit Company, dated July 16, 1993. That application showed, inter alia, (1) gross monthly salary of $10,833, or $129,996 annually, from Spring Hill restaurant, and (2) income from two

other restaurants, the amount of which was not stated on that application.  Petitioners submitted to Barnett Bank an application, dated October 19, 1993, for a line of credit in the amount of $75,000.  That application showed, inter alia, (1) gross monthly salary of $9,000 from three restaurants and (2) other monthly income of $1,800 in the form of interest, or total annual income of $129,600.

During the years at issue, petitioners did not receive any inheritances, legacies, or devises.

Petitioners filed joint tax returns (returns) for the years 1992, 1993, and 1994, in which they reported the following amounts of wages or salaries from the corporate owners of the restaurants indicated:

| Corporate Owner--Restaurant | Year | Mr. Mifsud | Ms. Mifsud | Total |
|---|---|---|---|---|
| Nichole & Eric, Inc.--Breakfast Club of 7 Hills | 1992 | $12,100 | $12,100 | $24,200 |
| | 1993 | 11,450 | 11,450 | 22,900 |
| | 1994 | 8,400 | 8,400 | 16,800 |
| Paul & Joe, Inc.--Spring Hill restaurant | 1992 | 11,150 | 14,600 | 25,750 |
| | 1993 | 8,050 | 8,050 | 16,100 |
| | 1994 | 8,575 | 8,500 | 17,075 |
| Crystal & Ryan, Inc.--The Breakfast Club | 1992 | 12,100 | 12,100 | 24,200 |
| | 1993 | 11,400 | 11,400 | 22,800 |
| | 1994 | 8,500 | 8,500 | 17,000 |
| Total by Year | 1992 | 35,350 | 38,800 | 74,150 |
| | 1993 | 30,900 | 30,900 | 61,800 |
| | 1994 | 25,475 | 25,400 | 50,875 |

In their return for each of the years at issue, petitioners reported a capital loss of $3,000. They also reported subchapter S losses of $20,002 in their 1992 return, $13,499 in their 1993 return, and $9,392 in their 1994 return. The amounts of total income reported by petitioners in their returns for 1992, 1993, and 1994 were $80,130, $74,699, and $62,658, respectively.

Petitioners reported the following amounts of interest income in Schedule B, Interest and Dividend Income, of their return for each year indicated:

| Year | Amount |
|------|--------|
| 1986 | $11,995 |
| 1987 | 13,108* |
| 1988 | 12,067** |
| 1989 | 25,286 |
| 1990 | 28,988 |
| 1991 | 25,709 |
| 1992 | 28,982 |
| 1993 | 29,398 |
| 1994 | 23,947 |

\* Includes $2,424 in tax-exempt interest.
\*\* Includes $2,452 in tax-exempt interest.

Petitioners reported the following amounts of interest expense in Schedule A, Itemized Deductions, of their returns for the years indicated:

| Year | Amount |
|------|--------|
| 1986 | $13,688 |
| 1987 | 5,135 |
| 1988 | 6,046 |
| 1989 | 13,570 |
| 1990 | 12,752 |
| 1991 | 9,394 |
| 1992 | 8,040 |
| 1993 | 4,382 |
| 1994 | 4,892 |

In Forms 1120S, U.S. Income Tax Return for an S Corporation, for 1992, 1993, and 1994, Paul & Joe, Inc., reported gross receipts in the amounts of $308,643, $334,427, and $307,478, respectively. In those forms, Paul & Joe, Inc., reported cost of goods sold in the amounts of $161,149, $208,999, and $151,120, respectively, of which $93,478, $117,149, and $90,164, respectively, were reported as "Purchases" and $68,543, $93,125, and

$62,804, respectively, were reported as "Cost of labor".

During the period 1982 through 1993, interest rates under section 6621 ranged as follows from a high of 20 percent in 1982 to a low of 7 percent in 1993:  Interest rates under section 6621 were 20 percent in 1982, 10 percent in 1986, 8 percent in 1987, 10 percent in 1990, 9 percent in 1991, 8 percent in 1992, and 7 percent in 1993.

In 1992, the collection division of the Internal Revenue Service (IRS) issued a summons because the IRS did not have a record that Paul & Joe, Inc., had filed a Form 1120S for any of the years 1985 through 1991.  When the IRS received no response to the summons, the matter was referred to the examination division of the IRS and assigned to William Joseph Slater (Mr. Slater), a revenue agent in that division.  Around October 1994, Mr. Slater wrote a letter to petitioners in which he indicated that the IRS had no record of having received Forms 1120S for Paul & Joe, Inc., and requested that they contact Mr. Slater to discuss the matter.  Because petitioners did not respond to Mr. Slater's letter, Mr. Slater contacted the individual who was shown in petitioners' returns as their return preparer in order to obtain an explanation regarding the failure of Paul & Joe, Inc., to file Forms 1120S.  Shortly thereafter, Mr. Slater received Forms 1120S for Paul & Joe, Inc., for 1991, 1992, and 1993, which were signed by Mr. Mifsud and petitioners' return

preparer. Those returns showed losses for Spring Hill restaurant. Mr. Slater compared petitioners' returns for 1991, 1992, and 1993 with Forms 1120S for Paul & Joe, Inc., for those years and ascertained, inter alia, that petitioners' returns for those years showed significant interest income. Mr. Slater also determined from IRS records that a currency transaction report had been filed with respect to petitioners which showed that on one day in 1993 they deposited more than $10,000 in cash into their bank account at Great Western Bank.

Mr. Slater decided to audit the restaurant business of Paul & Joe, Inc., notified petitioners and their return preparer by letter of that decision, and requested a meeting. Mr. Slater met with Mr. Mifsud and petitioners' return preparer. At that meeting, Mr. Slater asked Mr. Mifsud how he operated the restaurant business of Paul & Joe, Inc., inquired about the types of business records that were kept, and similar matters. Mr. Slater requested, and received, records relating to corporate bank accounts and other corporate documents. The only business records for Paul & Joe, Inc., relating to its gross receipts that were provided to Mr. Slater during his examination of Paul & Joe, Inc., and of petitioners were the sales sheets that Mr. Mifsud completed daily during the years under examination. No other such records were available because each night throughout those years Mr. Mifsud discarded the daily cash register tapes and

daily individual guest checks after he completed the sales sheet for the day.

Mr. Slater decided to expand his examination to petitioners individually and asked them to provide him with certain information, including personal bank statements. Mr. Slater conducted an analysis under the bank deposits method with respect to petitioners' bank deposits for the years 1993 and 1994. That analysis showed that for each of the years 1993 and 1994 petitioners had substantial deposits in excess of the income that they reported in their return for each of those years. Mr. Slater requested a meeting with petitioners and their return preparer whom they had authorized to represent them with respect to the examination by the IRS of their returns for 1993 and 1994. At that meeting, Mr. Slater asked for the source of petitioners' bank deposits. Mr. Mifsud informed Mr. Slater at that meeting that petitioners had a cash hoard from around 1980 when they moved from Michigan to Florida. Mr. Mifsud indicated at that meeting that immediately prior to petitioners' move to Florida they had $200,000 in cash and $11,000 in a bank in Detroit. When they moved to Florida they brought that cash with them and deposited into a Florida bank account the $11,000 that they had kept in a Detroit Bank. Mr. Mifsud further explained to Mr. Slater that petitioners kept the cash hoard until the years under examination by the IRS when, according to Mr. Mifsud, they

started depositing some of the cash hoard into petitioners' bank accounts because Ms. Mifsud was insisting that he do that in view of a robbery that occurred at petitioners' house in 1979.

Upon learning Mr. Mifsud's explanation of the amounts of cash deposits that petitioners made during 1993 and 1994 in excess of the income that they reported in their returns for those years, Mr. Slater asked Mr. Mifsud for any information that could corroborate their position that they had a cash hoard.  In response, petitioners gave Mr. Slater a copy of a newspaper article with respect to the robbery that took place in 1979 at their house in Michigan as well as tax returns for years prior to 1993.  However, no other information or documentation was pro-vided to Mr. Slater in an attempt to corroborate petitioners' position that their unexplained bank deposits were attributable to their claimed cash hoard.  Mr. Slater expanded his examination of petitioners to include their taxable year 1992, and he con-ducted an analysis under the bank deposits method of petitioners' bank deposits for that year.

In addition to auditing petitioners and Paul & Joe, Inc., Mr. Slater also examined Ms. Mamo and Mr. Mamo who owned 40 percent of Paul & Joe, Inc.  Mr. Slater did not find any sub-stantial unexplained cash deposits by them during the years under examination.

Respondent issued a notice of deficiency (notice) to petitioners with respect to their taxable years 1992, 1993, and 1994. In the notice, respondent determined, inter alia, that petitioners had unreported income for 1992, 1993, and 1994 in the amounts of $60,034, $53,094, and $57,891, respectively, the likely source of which was Paul & Joe, Inc. In making those determinations, respondent relied on an analysis under the bank deposits method of petitioners' bank deposits during the years at issue, which showed that petitioners had unexplained bank deposits during those years. Respondent further determined in the notice that the cost of goods sold reported by Paul & Joe, Inc., for 1993 and 1994 was understated in the amounts of $16,515 and $19,637, respectively, because Mr. Mifsud made purchases for Paul & Joe, Inc., during those years, which were not reimbursed by that company.[3] In the notice, respondent determined that petitioners had deficiencies in tax (and underpayments) for 1992, 1993, and 1994 in the amounts of $18,087, $15,653, and $17,073, respectively. Respondent further determined in the notice that petitioners are liable for each of the years at issue for the fraud penalty under section 6663 on the entire amount of each such underpayment.

---

[3] The notice indicates that no adjustment was made to cost of goods sold for 1992 because no information was available for that year.

In respondent's answer, respondent alleged in the alternative to the allegations in the answer that were based on the determinations in the notice that petitioners had increased deficiencies in tax (and underpayments) for the years at issue and that such increased underpayments of tax are due to fraud.

OPINION

Except for the fraud penalty and the increased deficiencies alleged in respondent's answer on which respondent has the burden of proof, see sec. 7454(a); Rule 142(b) and (a), petitioners have the burden of establishing that respondent's determinations in the notice are erroneous, see Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

We turn to the fraud penalty under section 6663. That is because our resolution of that issue is determinative of petitioners' contentions that respondent's deficiency determinations in the notice are erroneous, that respondent has not shown that petitioners have the increases in such deficiencies that were alleged as part of respondent's alternative position in the answer, and that the period of limitations for 1992 has expired.

In order for the fraud penalty to apply, respondent must prove by clear and convincing evidence that an underpayment exists and that some portion of such underpayment is attributable to fraud. See secs. 6663(a), 7454(a); Rule 142(b); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). If respondent es-

tablishes that any portion of an underpayment is attributable to fraud, the entire underpayment is to be treated as attributable to fraud, except with respect to any portion of such underpayment which the taxpayer establishes by a preponderance of the evidence is not attributable to fraud.  See sec. 6663(b).  In a situation such as the present case in which the allegations of fraud are intertwined with unreported and indirectly reconstructed income, respondent can satisfy the burden of establishing an underpayment in one of two ways:  (1) Where the taxpayer alleges a nontaxable source for the unreported income reconstructed by respondent, by disproving that alleged nontaxable source, see Parks v. Commissioner, 94 T.C. 654, 661 (1990), or (2) by proving a likely source of that unreported income, see Parks v. Commissioner, supra.

The parties stipulated that petitioners made bank deposits during 1992, 1993, and 1994 totaling $197,097.69, $204,944, and $288,841, respectively.  As part of respondent's alternative position in the answer, respondent permitted petitioners to reduce their total bank deposits for 1992, 1993, and 1994 by $46,644, $49,638, and $122,459, respectively, which were the amounts of deposits that respondent concluded were attributable to nontaxable sources.[4]  Petitioners do not dispute the amounts

---

[4]  Under respondent's position in the answer that is based
(continued...)

of those reductions of petitioners' bank deposits for the years at issue.[5] However, petitioners contend that for each year at issue the excess of (1) petitioners' bank deposits reduced by those amounts attributable to nontaxable sources that respondent allowed over (2) the amount of total income that petitioners reported in their return for each such year also is attributable to a nontaxable source, namely, a cash hoard.

Respondent may disprove petitioners' allegation of a cash hoard by showing that respondent's reconstruction of income under the bank deposits method is accurate and that petitioners' allegation of a cash hoard is inconsistent, implausible, and not supported by objective evidence in the record. See Parks v. Commissioner, supra. On the record before us, we find that respondent's reconstruction of petitioners' income under the bank deposits method, as alleged as part of respondent's alternative position in the answer, is accurate. Indeed, the only complaint

---

[4] (...continued)
on the notice, respondent reduced petitioners' total deposits for the years at issue in amounts of such deposits that were greater than those allowed under respondent's alternative position in the answer.

[5] Respondent also adjusted the total income of Paul & Joe, Inc., (1) for 1993 in the amounts of $14,515 for corporate purchases paid for by Mr. Mifsud and $2,000 for checks deposited to that business for cash and (2) for 1994 in the amounts of $11,946 for corporate purchases paid for by Mr. Mifsud and $7,691 for checks deposited to that business for cash. Petitioners do not dispute those adjustments.

that petitioners have about that reconstruction is that respondent failed to reduce their bank deposits for each of the years at issue by the total amount of such deposits for each such year that petitioners claim was attributable to their cash hoard.

To support their position that the source of the unreported income alleged by respondent under respondent's alternative position in the answer was their cash hoard, petitioners rely principally on the testimony of Mr. Mifsud and to a lesser extent on the testimony of Ms. Mifsud, Ms. Mamo, and Mr. Mamo. We are not required to, and we do not, accept the self-serving testimony of petitioners. Nor are we required to, and we do not, accept any testimony of petitioners' daughter Ms. Mamo or of Mr. Mamo, the father of two of petitioners' grandchildren and their former son-in-law, which serves petitioners' interest in this case. See Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

We found the testimony of Mr. Mifsud and of Ms. Mifsud that they had a cash hoard which was the source for each of the years at issue for the bank deposits at issue to be implausible, inconsistent with and/or not supported by objective evidence in the record, and not credible. By way of illustration, we found Mr. Mifsud's testimony that in 1951 his father brought approxi-

mately $500,000 from Malta to the United States, large amounts of which Mr. Mifsud claims his parents gave to him both during his father's lifetime and after his father died, to be implausible, inconsistent with and not supported by objective evidence in the record, and not credible. The record establishes that in 1951 Malta was under English exchange controls which limited the ability of Maltese persons to bring currency out of the country. The export of currency from Malta in 1951 in an amount of pounds or any other form of currency equal to approximately $500,000 would have had a serious impact on Malta's economy and the policy of its Government and would have been required by the English exchange controls to have been documented. Malta has no official record that an export from Malta took place in 1951 of currency in an amount of pounds or any other form of currency equal to approximately $500,000. The record also establishes that in 1951, when Mr. Mifsud and his father emigrated from Malta to the United States, Malta, which had been devastated during World War II by German air strikes, was a nation of small shopkeepers, dockworkers, and bureaucrats, with a small Anglo-Maltese ruling class. Estimates of Maltese national income in the postwar period ranged from $28.2 million to $48.3 million, and the median wage for private workers in Malta was about $11 per week, or $572 per year.

By way of further illustration of testimony of Mr. Mifsud that we found to be implausible, inconsistent with and not supported by objective evidence in the record, and not credible Mr. Mifsud testified that his father owned a very large, eight-bedroom house in Malta, which, according to Mr. Mifsud, his father sold for 30,000 pounds in 1952, or $146,400 at the then prevailing exchange rate of $4.88 per pound.  Maltese official records show only two purchases and one sale of real property by Mr. Mifsud's father and one sale by Mr. Mifsud and certain of his family members.  In November 1929, Mr. Mifsud's father purchased a house in Malta for 570 pounds.  In April 1937, he sold that house for 270 pounds.  In September 1938, Mr. Mifsud's father purchased another house in Malta for 350 pounds.  In 1966, Mr. Mifsud, along with his mother, three brothers, and a sister sold a house in Malta for 2,600 pounds, or $7,254 at the exchange rate in effect in 1966 of $2.79 per pound.

We also found implausible, not supported by objective evidence in the record, and not credible Mr. Mifsud's testimony that although his father did not have to work since he brought with him approximately $500,000 from Malta in 1951, he decided to take a position about a year after he emigrated to the United States when he was 48 years old as a head waiter at a hotel in Detroit because he was bored.  We simply do not believe that Mr. Mifsud's father would have undertaken such physically demanding

work if, as Mr. Mifsud testified, his father did not have to do so because he brought approximately $500,000 with him to the United States a year before he started working as a head waiter. Nor do we believe that Mr. Mifsud's elderly and ill mother would be living on Social Security benefits and gifts from her children if, in fact, Mr. Mifsud's father had brought around half a million dollars to the United States in 1951, which would have belonged to her upon the death of Mr. Mifsud's father.

To illustrate further why we shall not accept and rely on the testimony of Mr. Mifsud and Ms. Mifsud relating to petitioners' claim that the source of the bank deposits at issue was a cash hoard which they brought with them when they moved from Michigan to Florida, Mr. Mifsud testified that petitioners brought $332,000 in cash and $69,000 in bank deposits to Florida when they moved there in 1980. However, Ms. Mifsud testified that petitioners had "over $200,000 cash" when they moved from Michigan to Florida. Moreover, during the examination of Paul & Joe, Inc., and of petitioners by the IRS, Mr. Mifsud told Mr. Slater, the revenue agent responsible for that examination, that the source of funds that petitioners deposited into their bank accounts during the years at issue was $200,000 in cash, which they brought with them when they moved from Michigan to Florida.[6]

---

[6] Mr. Mifsud also told Mr. Slater during the IRS'
(continued...)

Mr. Mifsud also testified that around 1983 he began depositing money from petitioners' alleged cash hoard into various bank accounts in increments of $3,000 to $10,000 usually once a week or every three weeks. However, Mr. Mifsud told Mr. Slater during the IRS' examination of Paul & Joe, Inc., and of petitioners that petitioners began depositing their cash hoard during the years at issue, and Ms. Mifsud testified that they began depositing their cash hoard in 1992. Moreover, the amounts of the various bank deposits that petitioners made throughout the years at issue are for the most part much smaller than the level of deposits that Mr. Mifsud testified he made from his cash hoard during those years (i.e., from $3,000 to $10,000).

Assuming arguendo that, starting in 1983, Mr. Mifsud made 17 deposits of $3,000 a year, a conservative assumption in light of Mr. Mifsud's testimony that around 1983 petitioners began depositing cash in increments of $3,000 to $10,000 usually once a week or every three weeks, petitioners would have deposited within six and a half years, or by around 1989 or 1990, all of the $332,000 in cash that Mr. Mifsud claims petitioners brought with them in 1980 when they moved from Michigan to Florida. Furthermore, under the same assumption, petitioners would have

---

6 (...continued)
examination of petitioners that they brought $11,000 in bank deposits when they moved to Florida from Michigan.

deposited within four years, or by around 1987, all of the $200,000 in cash which Mr. Mifsud informed Mr. Slater petitioners brought with them to Florida in 1980. If the Court were to accept Mr. Mifsud's testimony as to when petitioners started making bank deposits from their alleged cash hoard and the amounts and frequency of such deposits, such alleged cash hoard would have been fully deposited into petitioners' bank accounts well before 1992, the first year at issue, regardless whether it is assumed that petitioners had $332,000 or $200,000 in cash when they moved from Michigan to Florida in 1980.

Another illustration of the implausibility, inconsistency, and lack of credibility of Mr. Mifsud's testimony relates to his claim at trial that he maintained a cash hoard because he was distrustful of banks, a distrust, according to his testimony, that he learned from his parents. The record belies Mr. Mifsud's claim that he was distrustful of banks. At all relevant times, petitioners maintained multiple bank accounts into which they deposited in the aggregate large amounts of cash. For example, petitioners had $220,870.67 on deposit at Barnett Bank on December 31, 1991. In addition, during 1992, 1993, and 1994, they made bank deposits totaling $197,097.69, $204,944, and $288,841, respectively. Furthermore, at all relevant times, Mr. Mifsud was knowledgeable about Federal deposit insurance, which protects bank deposits of one person up to $100,000. He also was knowl-

edgeable about interest rates and transferred his bank investments from deposits in checking and/or savings accounts to one or more certificates of deposit whenever the applicable interest rate on such a certificate would yield a greater return for petitioners. Mr. Mifsud also admitted that he had never heard of a bank in the United States that had failed and thereby caused injury to its depositors.

Mr. Mifsud's own testimony belies his testimony that he learned to distrust banks from his parents. Mr. Mifsud testified that his mother "made" him open a savings account with Detroit National Bank. It is implausible to us that his parents were distrustful of banks and taught Mr. Mifsud to distrust them, and yet Mr. Mifsud's mother "made" him open a savings account with a Detroit bank.

Other facts established by the record further erode the credibility of petitioners' claim that their cash hoard was the source for the bank deposits at issue. For example, petitioners had interest income of $23,947 or more for each of the years at issue and received interest income in excess of $10,000 during every year starting in 1986. Petitioners' interest income for 1987 and 1988 included tax-exempt interest. We believe that a person like Mr. Mifsud, who was sophisticated enough to seek and receive tax-exempt interest, buy certificates of deposit when interest rates on such deposits yielded petitioners a greater

return than the interest that they were earning on their checking and/or savings bank accounts, and refinance the mortgage loan on their house when interest rates fell below the interest rate applicable to that loan, would not forgo the ability to earn interest income on petitioners' alleged cash hoard of $332,000 (or even $200,000), especially considering the high interest rates available during the 1980's, which peaked at 20 percent in 1982. Considering those high interest rates, petitioners would have forgone interest income of as much as $60,000 a year by keeping the alleged cash hoard of $332,000 at home and not depositing it into banks. That amount of forgone interest income is more than petitioners reported as total income for any of the years 1986 through 1991. We do not believe that petitioners would have forgone such interest income, and we do not believe that they did. That is because we do not find credible their claim that their cash hoard of $332,000 (or $200,000) was the source of the bank deposits at issue.

It is also significant that Mr. Mifsud testified at trial that he could not recall the amount of petitioners' alleged cash hoard that they deposited into their bank accounts during each of the years at issue. We find Mr. Mifsud's claimed inability to remember those alleged matters to be suspect in view of his ability to remember with specificity other facts relating to petitioners' financial situation. For example, Mr. Mifsud was

able to recall the precise amount of the monthly mortgage loan payment (i.e., $38.55) that was required with respect to the first house that petitioners purchased in 1960. We believe that Mr. Mifsud's inability to remember the amount of petitioners' alleged cash hoard that they deposited into their bank accounts during each of the years at issue is attributable to the fact that they did not make such deposits.

Another aspect of Mr. Mifsud's and Ms. Mifsud's testimony that we found to be implausible and not credible relates to their assertion at trial that they made bank deposits during the years at issue from their cash hoard because of Ms. Mifsud's strong fear that their house in Florida would be burglarized, which fear was precipitated by the 1979 robbery at their house in Michigan. Petitioners' testimony rings hollow. If, in fact, Ms. Mifsud's fear that petitioners' house in Florida would be burglarized were as strong as petitioners testified, we cannot fathom why they would have continued to keep large amounts of cash in their house throughout the 1980's and the years at issue, as they contend they did.

On the record before us, we find petitioners' contention that the source of the bank deposits at issue during the years at issue was their cash hoard to be implausible and inconsistent with and/or not supported by objective evidence in the record.

Indeed, we find the testimony of both Mr. Mifsud and Ms. Mifsud regarding such deposits to be patently incredible.

Based on our examination of the entire record in this case, we find that respondent has established by clear and convincing evidence that under the bank deposits method petitioners have unreported income for each of the years 1992, 1993, and 1994 in the amounts of $70,323.69, $80,607, and $103,724, respectively. See Parks v. Commissioner, 94 T.C. at 661.[7] We further find on

---

[7] Since respondent has disproved petitioners' alleged nontaxable source of the bank deposits at issue and thereby has satisfied respondent's burden of establishing an underpayment for each of the years at issue, see Parks v. Commissioner, 94 T.C. 654, 661 (1990), we need not address whether respondent has established a likely source of petitioners' unreported income for those years, see id. We nonetheless note that we find on the record before us that respondent has shown by clear and con- vincing evidence a likely source of that unreported income, viz., Spring Hill restaurant. We also believe that The Breakfast Club at which Mr. Mifsud spent time during the years at issue working, inter alia, at the cash register was a likely source for at least some of the unreported income of petitioners for those years. Crystal & Ryan, Inc., owned The Breakfast Club, and petitioners owned 51 percent of the stock of that S corporation.
The record establishes that Mr. Mifsud admitted in a credit application that he submitted to Ford Motor Credit Company, dated July 16, 1993, that he had, inter alia, (1) gross monthly salary of $10,833, or $129,996 annually, from Spring Hill restaurant, and (2) income from two other restaurants, the amount of which was not stated on that application. Petitioners also admitted in an application for a line of credit in the amount of $75,000, dated Oct. 19, 1993, which they submitted to Barnett Bank that they had, inter alia, (1) gross monthly salary of $9,000 from three restaurants and (2) other monthly income of $1,800 in the form of interest, or total annual income of $129,600. Even Mr. Mamo, petitioners' former son-in-law and the father of petition- ers' grandchildren, admitted at trial that around 1991, the last year during which Mr. Mamo worked at Spring Hill restaurant,

(continued...)

that record that petitioners have a deficiency in tax for each of the years 1992, 1993, and 1994 attributable to (1) petitioners' unreported income that we have found for each of those years and

---

7 (...continued)
that restaurant was generating as much as approximately $420,000 of gross receipts annually. That amount is well in excess of the gross receipts of $289,648, $308,643, $334,427, and $307,478 for 1991, 1992, 1993, and 1994, respectively, that Paul & Joe, Inc., reported in Forms 1120S for those years.

In an attempt to show that Spring Hill restaurant could not have been the source of the bank deposits at issue, petitioners proffered the testimony of Theodore R. Mandigo (Mr. Mandigo) whom the Court found qualified as an expert in the restaurant business. Petitioners' expert acknowledged during his testimony that he based his opinion that Spring Hill restaurant could not have been the source of those deposits on data provided to him by petitioners. For example, petitioners' expert witness assumed that Paul & Joe, Inc., had gross receipts of $306,000, $334,000, and $307,000 during 1992, 1993, and 1994, respectively, which were approximately the amounts that Paul & Joe, Inc., reported as gross receipts in Forms 1120S for those years. Those amounts of gross receipts are belied by Mr. Mamo's testimony that during 1991 Spring Hill restaurant generated gross receipts of as much as approximately $420,000 and by the credit applications that Mr. Mifsud and petitioners, respectively, submitted during 1993. Petitioners' expert witness also assumed that the amounts of cost of goods sold of Spring Hill restaurant for the years at issue that petitioners provided to him were accurate. However, the parties stipulated that the cost of goods sold of Paul & Joe, Inc., was understated for 1993 and 1994 in the amounts of $14,515 and $11,946, respectively, because, for some unexplained reason, Paul & Joe, Inc., did not claim all of its expenses. Mr. Mandigo conceded that if the data which petitioners provided to him and on which his opinion was based were incorrect, his opinion would change. We conclude that petitioners' expert witness has not rebutted the evidence in the record establishing that Spring Hill restaurant was capable of producing the bank deposits at issue.

(2) the $2,600 of unreported income for each of those years to which the parties agreed at trial.[8]

We turn now to the requirement of fraudulent intent under section 6663.  To prove fraudulent intent on the part of petitioners for the years at issue, respondent must establish by clear and convincing evidence that they intended to evade tax for each such year, which they believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax.  See Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661.  The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  See DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is never presumed or imputed and should not be found in circumstances which create at most only suspicion.  See Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Katz v. Commissioner, 90 T.C. 1130, 1144 (1988).

---

[8]  See supra note 2.

Direct evidence of the requisite fraudulent intent is seldom available.  See Petzoldt v. Commissioner, supra at 699; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  Consequently, respondent may prove fraud by circumstantial evidence.  See Toussaint v. Commissioner, supra at 312; Marsellus v. Commissioner, 544 F.2d 883, 885 (5th Cir. 1977), affg. T.C. Memo. 1975-368; Rowlee v. Commissioner, supra at 1123.

The courts have identified a number of badges of fraud from which fraudulent intent may be inferred, including (1) consistent and substantial understatement of income, (2) inconsistent or implausible explanations of behavior, (3) lack of credibility of the taxpayer's testimony, and (4) dealing in cash.  See Laurins v. Commissioner, supra at 913; Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; Niedringhaus v. Commissioner, 99 T.C. at 211; Parks v. Commissioner, supra at 664-665; Miller v. Commissioner, 94 T.C. 316, 334 (1990); Recklitis v. Commissioner, supra at 910; Castillo v. Commissioner, 84 T.C. 405, 409 (1985); Rowlee v. Commissioner, supra at 1125.  In addition, the taxpayer's background and the context of the events in question may be considered circumstantial evidence of fraud.  See Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Niedringhaus v. Commissioner, supra at 211.  Although

no single factor is necessarily sufficient to establish fraud, the existence of several indicia constitutes persuasive circumstantial evidence of fraud.  See Bradford v. Commissioner, supra at 307; Petzoldt v. Commissioner, supra at 700.

The record in this case is replete with indicia of fraud by petitioners, including the following:  Petitioners consistently failed to report substantial amounts of income for the years 1992, 1993, and 1994.  They gave inconsistent and implausible explanations about the source of the bank deposits at issue.  We did not find the testimony of either Mr. Mifsud or Ms. Mifsud to be credible in many material respects, including their testimony that the source of the bank deposits at issue was their alleged cash hoard.  The restaurant business in which petitioners engaged dealt primarily in cash, and most of the deposits that petitioners made during the years at issue were in cash.

Based on our examination of the entire record in this case, we find that respondent has established by clear and convincing evidence that petitioners intended to evade tax for each of the years 1992 through 1994, which they believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax.[9]  We further find on that record that

---

[9]  We have considered all of the contentions and arguments of petitioners that are not discussed herein, and we find them to be without merit.

petitioners are liable for the fraud penalty under section 6663 for 1992, 1993, and 1994 on the underpayment attributable to (1) petitioners' unreported income that we have found for each of those years and (2) the $2,600 of unreported income for each of those years to which the parties agreed at trial.[10]  See sec. 6663(a) and (b).

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.

---

[10]  See *supra* note 2.